IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SAMUEL D. NIIARYEE,            )
        Plaintiff,       )    Civil Action No. 17-1225
                         )
    v.               )
                         )    Judge Cathy Bissoon
DAVISON DESIGN & DEVELOPMENT,  )
INC.,                          )
        Defendant.       )

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Pending before the Court is a Motion to Dismiss filed by Defendant Davison Design & Development, Inc. ("Davison" or "Defendant") (**Doc. 6**), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendant's Motion will be GRANTED IN PART AND DENIED IN PART.

### A. BACKGROUND[1]

Plaintiff is the inventor of "an electric-powered leaf-blower and mulcher called the 'Fallapro.'" Compl. (Doc. 1-2) at ¶ 3. According to Plaintiff, Fallapro was "different from similar products on the market because it was smaller, lighter and operated on electric power, rather than gasoline." Id. at ¶ 4. Plaintiff initially contacted Davison Design "sometime in late 2005/early 2006 to inquire about the Defendant's services." Id. at ¶ 5. Plaintiff "explained to

---

[1] The following background facts are taken from Plaintiff's Complaint (Doc. 1-2). Because the case is presently before this Court on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom. See Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). In addition, the Court views all well pleaded factual averments and reasonable inferences in the light most favorable to the non-moving party. Id.

1

Defendant that the primary marketable characteristic of his invention was its ability to run on electricity instead of gasoline." Id. at ¶ 6.

On June 6, 2007, Plaintiff entered into two contracts with Davison Design: a "Pre-Inventegration Agreement" and a "Contingency Agreement." Id. at ¶ 11. Under the Pre-Inventegration Agreement, Davison Design was required to perform: (1) "an industry product search that will attempt to locate competitive items that may be available currently"; (2) "a patent search for design development purposes"; and (3) "[p]rofessional research, quality review, assembly and mailing of [a] research portfolio." Id. at ¶ 8. Under the Contingency Agreement, Davison Design was required to "use its best efforts to submit Client's product to a Licensee." Id. at ¶ 10. Plaintiff paid $685.00 for these services. Id. at ¶ 11. Sometime thereafter, Plaintiff received the research described in the Pre-Inventegration Agreement, which he claims was "inadequate, unprofessional and was not the result of [Davison Design's] best efforts." Id. at ¶ 19. Plaintiff also received a binder titled "Inventegration Portfolio," which included a document titled "Necessity of Pre-Inventegration Services." Id. at ¶ 12. That document stated that Defendant's research services were "necessary before proceeding to the step of product sample design and development and attempting to obtain a license agreement with the corporation." Id. The "Inventegration Portfolio" also included a document stating that Defendant could provide Plaintiff with electrical engineering services, among other in-house services. Id. at ¶ 13.

On September 14, 2007, Plaintiff received a letter from Defendant's President, George M. Davison, welcoming Plaintiff "as a member of an elite group" of investors and stating that Ariens had "been chosen as the primary target licensing corporation" to market Plaintiff's product. Id. at ¶ 14. On October 8, 2007, Plaintiff received a letter from Anthony Isacco,

2

Senior Director of New Products for Defendant, stating, among other things, that Defendant was able to "compile all of the functions and features of [Plaintiff's] original idea into one complete, cost-effective product that we can present to the manufacturer." Id. at ¶ 17.

On October 10, 2007, Plaintiff entered into a third contract with Defendant called the "New Production Sample Agreement." Id. at ¶ 23. Under the New Production Sample Agreement, Defendant agreed to build a prototype of Plaintiff's product "after examining the features and functions of the Invention and the targeted corporation's manufacturing and marketing capabilities." Id. at ¶ 20. Defendant also agreed to produce and send to Plaintiff "various marketing tools, including an infomercial, a hard-backed booklet which contained an Executive Summary, and marketing photographs." Id. at ¶ 21. For these services, Plaintiff paid Davison $12,995.00, and granted Davison a 10% royalty. Id. at ¶ 22. Defendant ultimately sent Plaintiff a "2D rendering of the prototype." Id. at ¶ 18. However, "the rendering failed to reveal that the design had been changed from Plaintiff's electric motor to a gas-powered design." Id.

On or about November 23, 2009, Plaintiff received a form letter from Defendant stating that the initial target licensing company "passed on the project" but there was "another company in mind to approach" with Plaintiff's idea. Id. at ¶ 24. The letter stated that if Plaintiff wished to continue pursuing other licensing companies, he would have to pay Defendant an additional amount for "presentations and follow ups." Id. Defendant sent Plaintiff at least six such form letters informing him that the previous target company "passed on the project," and that he would have to pay an additional amount to pitch the product to another licensing company. Id. at ¶ 25. Although Plaintiff requested, and paid for, repackaging of his invention, Defendant did no more than change the logo sent to each target licensing company. Id. at ¶ 27. On or around March 2014, Defendant sent Plaintiff a letter stating that there were no more licensing

corporations to target.  Id. at ¶ 28.  Sometime after he received the March 2014 letter, Plaintiff requested that Defendant send him the prototype of his invention.  Id. at ¶ 29.  When Plaintiff received the prototype from Defendant, he realized that it was gas-powered rather than electric-powered, as he had originally designed.  Id.  Defendant never disclosed that it had changed his design.  Id.  In the time since Plaintiff initially contracted with Defendant, other inventors and companies had successfully designed and sold electric-powered leaf-blowers/mulchers, effectively prohibiting Plaintiff from successfully introducing his own invention on the market as an original concept.  Id. at ¶ 30.

On November 13, 2015, Plaintiff initiated an action against Defendant in the Court of Common Pleas of Allegheny County, Pennsylvania by filing a Praecipe for Writ of Summons.  On August 25, 2017, Plaintiff filed a seven-count Complaint against Defendant, asserting claims for Breach of Contract (Count I), Violation of the American Inventors Protection Act (Count II), Fraudulent Misrepresentation (Count III), Negligent Misrepresentation (Count IV), Unjust Enrichment (Count V), Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count VI), and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count VII).  Defendant timely removed the case to federal court, and, on October 10, 2017, filed the pending Motion to Dismiss, which is ripe for adjudication.

**B.     ANALYSIS**

   **1.     Whether Counts I through V Are Time-Barred**

Defendant first argues that Counts I through V of the Complaint are barred by the applicable statutes of limitations.  Doc. 7 at 5-9.  A statute of limitations defense may be raised in a 12(b)(6) motion to dismiss, "but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'  'If the bar is not

apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).'" Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (quoting Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978) and Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975)); see also Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994) ("While the language of Fed.R.Civ.P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.") (citations omitted).

The parties here agree that the relevant statutes of limitations for Plaintiff's claims range from two to four years. See 42 Pa.C.S. § 5525 (Plaintiff's breach of contract and unjust enrichment claims are subject to a four-year statute of limitations); 28 U.S.C. §1658(a) (Plaintiff's American Inventors Protection Act (AIPA) claim is subject to the federal four-year "catch-all" statute of limitations); 42 Pa.C.S. § 5524(7) (Plaintiff's fraudulent and negligent misrepresentation claims are subject to a two-year statute of limitations). The parties disagree, however, as to when Plaintiff's claims first accrued. Defendant argues that Plaintiff's claims accrued as early as October 2007 when he received "a 2D rendering of the prototype" and industry-specific market "research," which he claims was "inadequate, unprofessional, and . . . not [the] result of Defendant's best efforts." See Doc. 7 at 7 (citing Doc. 1-2 ¶¶ 18-19). Defendant further argues that, at the very least, Plaintiff's claims accrued in November 2009, when he began receiving correspondence from Defendant that the target corporations "had passed on the project." Doc. 7 at 7 (citing Doc. 1-2 ¶ 24). Plaintiff responds that, while he received several "deliverables" from Defendant before 2014, none disclosed that the prototype

5

Defendant had been marketing to target companies was gas-powered rather than electric-powered.  Doc. 11 at 4-5.  Plaintiff argues that, under Pennsylvania's discovery rule, his claims did not accrue until March 2014, when he first learned that his original design had been changed without his knowledge or approval.  Id.

"The general rule is that the statute of limitations begins to run as soon as a right to institute and maintain suit arises."  Haugh v. Allstate Ins. Co., 322 F.3d 227, 231 (3d Cir. 2003) (citing Crouse v. Cyclops Indus., 745 A.2d 606, 611 (2000)).  However, under Pennsylvania's discovery rule, the statute of limitations does not accrue "until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct."  Fine v. Checcio, 870 A.2d 850, 859 (Pa. 2005).  The Pennsylvania Supreme Court further explains:

> when a court is presented with the assertion of the discovery rule[']s application, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it.  Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.

Id. at 858-59 (citations omitted).

Based on the allegations in the Complaint, the Court agrees with Defendant that Plaintiff knew, or should have known, that the "deliverables" Defendant provided to Plaintiff in or around October 2007 (*i.e.*, the 2-D rendering of the Fallapro prototype and industry-specific market research) were "inadequate" at the time he received them.  Accordingly, to the extent that Plaintiff relies on those alleged deficiencies to support his breach of contract claim, that portion of his claim is time-barred.  See Doc. 1-2 ¶ 32(a) (basing his breach of contract claim, in part, on

the allegation that "Defendant failed to perform industry-specific product research as described and agreed to in the 'Pre- Inventegration Agreement'").

However, at this juncture, the Court cannot conclude, based solely on the allegations in the Complaint, that the remainder of Plaintiff's claims are time-barred. See Fine, 870 A.2d at 859. According to the Complaint, Defendant informed Plaintiff in March 2014, that there were no additional licensing companies to approach and terminated the parties' agreements. Doc. 1-2 at ¶ 28. Prior to that time, the parties were engaged in an ongoing contractual relationship, during which Plaintiff may not have known the full extent of Defendant's efforts to tailor and market his products and produce deliverables under the "Pre-Inventegration Agreement" and the "New Production Sample Agreement." In particular, it was not until March 2014, that Plaintiff learned that Defendant failed to produce a prototype in accordance with the Plaintiff's original idea. Id. at ¶ 29. Plaintiff filed a Praecipe for Writ of Summons on November 13, 2015, less than two years after receiving that prototype and within the applicable statutes of limitations.

Although Defendant argues that Plaintiff should have been on notice of potential "storm warnings" in 2009, Doc. 7 at 7, when he received the first rejection from a target company, there is no indication in the Complaint that Plaintiff knew, or should have known, any time prior to March 2014, that Defendant was not marketing his concept. Id. at ¶ 29. Furthermore, there is nothing in the Complaint indicating that Plaintiff could have accessed the prototype prior to the termination of the parties' relationship. Id. Likewise, it is not clear from the face of the Complaint when Plaintiff obtained—or had access to—the "repackaged" renderings that Defendant provided to the various target companies. Id. ¶ 27. Accordingly, the Court finds that factual questions remain as to Plaintiff's diligence and ability to access information related to his alleged injuries before March 2014.

Because the Court cannot conclude, based solely on the allegations in the Complaint, that Plaintiff knew or should have known of his alleged injuries before March 2014, Defendant's motion to dismiss Counts I through V as time-barred must be denied.

## 2. Whether Plaintiff's UTPCPL Claim is Barred

Defendant next argues that Plaintiff lacks standing to bring a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), and moves to dismiss Count VI on that basis. Doc. 7 at 9-11.

As Defendant argues, a private cause of action under the UTPCPL is restricted to an individual who "purchases or leases goods or services primarily for personal, family or household purposes." 73 Pa. C.S.A. § 201-9.2(a). Pennsylvania courts have been careful to distinguish between "purchases made for business reasons, which are not actionable, from those made for 'personal, family or household use.'" Balderston v. Medtronic Sofamor Danek, Inc., 285 F.3d 238, 242 (3d Cir. 2002) (citations omitted). The determination of "whether a purchase is used primarily for household purposes . . . depends on the purpose of the purchase, not the type of product purchased." Carpenter v. Shu-Bee's, Inc., 2012 WL 2594276, at *2 (E.D. Pa. July 5, 2012); see also Morales v. Superior Living Prod., LLC, 2009 WL 3234434, at *13 (E.D. Pa. Sept. 30, 2009), aff'd F. App'x 812 (3d Cir. 2010) (dismissing the complaint and finding that a plaintiff engaged in the business of bathroom renovation had purchased a bathtub for his business and not personal use).

Here, the Complaint clearly states that Plaintiff purchased Defendant's services for business reasons. Specifically, Plaintiff alleges that he purchased Defendant's services in order to bring his invention to the market. Doc. 1-2 at ¶ 40. Furthermore, Plaintiff signed an agreement with Defendant stating that the parties "are interested in working together to

investigate the possibility of obtaining a License Agreement whereby a corporation or other Licensee will pay a fee *to manufacture or sell/market the product*." Doc. 1-2 at ¶ 9 (emphasis added). Because Plaintiff did not purchase Defendant's services for "personal, family or household use," he lacks standing to bring a claim under the UTPCPL, and Defendant's motion to dismiss that claim will be granted.[2] Furthermore, because amendment of this claim would be futile, the Court will dismiss Count VI with prejudice. See Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004) (district courts must permit a curative amendment unless such an amendment would be inequitable or futile).

### 3. Whether The Gist of the Action Doctrine Bars Plaintiff's Tort Claims

Defendant also moves to dismiss Plaintiff's fraud and negligent misrepresentation claims based on the "gist of the action" doctrine, arguing that these claims merely restate his breach of contract claim. Doc. 7 at 11-14.

"The gist of the action doctrine precludes tort claims where the true gravamen, or gist, of the claim sounds in contract." Dommel Properties LLC v. Jonestown Bank & Trust Co., 2015 WL 5438847, at *2 (3d Cir. Sept. 16, 2015). The doctrine bars plaintiffs from "recasting ordinary breach of contract claims into tort claims." Jones v. ABN Amro Mortgage Grp., Inc., 606 F.3d 119, 123 (3d Cir. 2010) (citation omitted). "The critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of 'breaches of duties imposed by mutual consensus agreements between particular individuals,' while the latter arises

---

[2] Plaintiff cites to FTC v. Davison Assocs., 431 F. Supp. 2d 548 (W.D. Pa. 2006) ("FTC case"), as evidence of Defendant's history of misleading and deceptive practices and as support for Plaintiff's standing to assert a UTPCPL claim. However, while the FTC case held that Defendant made material misrepresentations in violation of the Federal Trade Commission Act's deceptive practices provision, it did not hold that the individuals, like Plaintiff, who purchased Defendant's services did so for personal, family or household use, as required by the UTPCPL.

9

out of 'breaches of duties imposed by law as a matter of social policy.'" Id. (citing Reardon v. Allegheny Coll., 926 A.2d 477, 486-87 (Pa. Super. Ct. 2007)).

In Bruno v. Erie Insurance Company, the Pennsylvania Supreme Court "reaffirm[ed]" this "duty-based demarcation" by concluding that "the nature of the duty alleged to have been breached" is "the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract." Bruno, 106 A.3d 48, 68, 69 (Pa. 2014). The Bruno Court further explained that "if the facts of a particular claim establish that the duty breached is one created . . . by the terms of their contract," then the claim sounds in contract. Id. at 68. If, however, the claim involves a broader social duty which "exists regardless of the contract," then a tort claim exists. Id. Accordingly, under Bruno, the Court must consider whether the relevant facts, as pleaded in Counts III and IV of the Complaint, state a claim for Defendant's breach of a contractual obligation created by the parties' agreements or, rather, for a "breach of an independent social duty imposed by the law of torts." Bruno, 106 A.3d at 68, 70; see Dommel Properties LLC, 2015 WL 5438847, at *4.

Based on the facts alleged in the Complaint, the Court finds that Plaintiff's fraud and negligent misrepresentation claims sound in contract, and thus are barred by the "gist of the action" doctrine. Indeed, several of the allegations supporting Plaintiff's fraud and negligent misrepresentation claims merely restate the allegations supporting his breach of contract claim. See, e.g., Doc. 1-2 ¶ 48 ("Defendant misrepresented to the Plaintiff that it would design and create a viable 'Production Sample' and 'Packaging Design' for each of the 'target' licensing companies that the Defendant claimed to have approached regarding the Defendant's product."); id ¶ 50 ("Defendant misrepresented the fact that the prototype was not the Plaintiff's original concept of design.").

10

Furthermore, to the extent Plaintiff claims that Defendant fraudulently induced him to enter into the agreements by misrepresenting its expertise, connections, and/or ability to perform its contractual duties, those claims are also barred by the "gist of the action" doctrine. See Doc. 1-2 ¶ 49 ("Defendant misrepresented the characteristics of the prototype that it was able to build."); id. ¶ 51 ("Defendant also made fraudulent misrepresentations to Plaintiff regarding Defendant's relationship with licensing companies, and Defendant's ability to locate appropriate licensing companies."); id. ¶ 61 (misrepresentations include "Defendant's connections to invention licensing companies [and] Defendant's experience as an invention promoter" as well as its ability and willingness "to design a prototype and packaging for Plaintiff's invention," "to individually package Plaintiff's invention for each invention licensing company," "to carefully select invention licensing companies to ensure that they were well-suited to receive Plaintiff's invention," "to assist Plaintiff's attempt to obtain a patent for his invention" and "to obtain potential licenses for Defendant's invention").

Notably, although some courts have recognized a distinction between claims of fraud in the performance of a contract and fraud in the inducement to contract, see Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 719 (Pa. Super. Ct. 2005), numerous courts have held that the "gist of the action" doctrine bars fraudulent inducement claims where the false representation concerned duties later enshrined in the contract. See Vives v. Rodriguez, 849 F. Supp. 2d. 507, 518–20 (E.D. Pa. 2012); Wen v. Willis, 117 F. Supp. 3d. 673, 681 (E.D. Pa. 2015) ("[W]here the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract," the claim may be dismissed under the gist of the action doctrine) (quoting Integrated Waste Sol'ns, Inc. v. Goverdhanam, 2010 WL 4910176, at *11 (E.D. Pa. Nov. 30, 2010)).

Here, Defendant's pre-contractual statements to Plaintiff regarding its ability and willingness to bring his idea to market ultimately were formalized in the parties' agreements requiring Defendant to, among other things, build a prototype of Plaintiff's invention and contact potential licensing companies on Plaintiff's behalf.  In other words, the crux of this action is, quite simply, that Defendant failed to fulfill its contractual promises, and hence, "the duty breached is one created by the parties by the terms of their contract." <u>Bruno</u>, 106 A.3d at 68.  Because the "nature of the duty" alleged to be violated arises out of Defendant's contractual promises, and not a broader social duty, the Court will dismiss Plaintiff's fraud and negligent misrepresentation claims pursuant to the "gist of the action" doctrine.  Once again, because any amendment to these claims would be futile, the Court will dismiss Counts III and IV with prejudice.

### 4. Plaintiff's Unjust Enrichment and Breach of the Implied Covenant of Good Faith and Fair Dealing Claims

In its Motion, Defendant moves to dismiss Counts V and VII of the Complaint asserting unjust enrichment and breach of the implied covenant of good faith and fair dealing claims.  Plaintiff does not object to the dismissal of those claims.  (Doc. 11 at 8).  Accordingly, the Court will dismiss Counts V and VII with prejudice.

## II. ORDER

For the reasons stated above, Defendant's Motion to Dismiss (Doc. 6) is GRANTED IN PART AND DENIED IN PART.

Consistent with the foregoing, the Court hereby DISMISSES with prejudice Counts III, IV, V, VI, and VII of the Complaint.  Defendant hereby is ORDERED to answer the remaining counts in the Complaint on or before March 13, 2018.

IT IS SO ORDERED.

February 27, 2018                                          s/Cathy Bissoon
                                                                                                  Cathy Bissoon
                                                                                                  United States District Judge

CC (via ECF email notification):

All Counsel of Record